# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLEMING, COOPER, and SCHLACK
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant First Class JUSTIN G. MURPHY**
**United States Army, Appellant**

ARMY 20230517

Headquarters, 1st Special Forces Command (Airborne)
Tyler J. Heimann, Military Judge
Lieutenant Colonel Burt D. Smith, Acting Staff Judge Advocate

For Appellant: Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Jonathan F. Potter, Esquire; Captain Amir R. Hamdoun, JA (on brief).

For Appellee: Colonel Richard E. Gorini, JA; Lieutenant Colonel K. M. Bohlke, JA; Major Justin L. Talley, JA; Captain Stewart A. Miller, JA (on brief).

22 July 2025

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

COOPER, Judge:

Appellant raises four assignments of error, all of which warrant discussion.[1] Appellant alleges: (1) the military judge erred in failing to grant a mistrial; (2) his two child endangerment convictions are factually and legally insufficient; (3) two of his domestic violence convictions are factually and legally insufficient; and (4) Specifications 8-12 of Charge II are multiplicious. Having fully considered briefs by counsel and the entire record, we find no error by the military judge in his decision not to grant a mistrial. However, we agree the child endangerment

---

[1] We have given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), both in his initial brief and in his supplemental *Grostefon* matters, and determine they merit neither discussion nor relief.

convictions and one domestic violence conviction are not factually sufficient. Finally, we find the remaining domestic violence convictions are not multiplicious. We grant appropriate relief in our decretal paragraph.

An enlisted panel convicted appellant, contrary to his pleas, of one specification of communicating a threat, two specifications of child endangerment, and six specifications of domestic violence, in violation of Articles 115, 119b, and 128b, Uniform Code of Military Justice, 10 U.S.C. §§ 915, 919b, 928b [UCMJ].[2] The panel sentenced appellant to a bad-conduct discharge, confinement for thirty months, and reduction to the grade of E-3.

## BACKGROUND

The misconduct giving rise to appellant's court-martial largely stemmed from a single evening in which appellant repeatedly assaulted his girlfriend, the victim, while her two sons were asleep in the home.

In the evening, appellant consumed alcohol mixed with caffeinated beverages and prescription medication. At some point, heavily intoxicated, he went outside and pounded on a neighbor's door.[3] The victim went to get appellant and bring him back to their house. Once inside, a naked appellant walked around the home, slamming doors. The victim attempted to guide him to their bedroom and eventually did, encouraging appellant to go to bed. The victim left appellant but remained outside the bedroom to ensure appellant did not leave the house or go upstairs to disturb her sleeping children.

At some point thereafter, appellant did get out of bed and began arguing with the victim at the bedroom door. Appellant grabbed the victim and pushed her into the door. The victim began recording appellant's behavior on her cellphone. The argument escalated when appellant slapped the victim's phone out of her hand prompting her to run into the living room. Appellant followed, and the victim fell onto a sofa. The phone, still recording, became trapped underneath her. Appellant then struck the victim's face and head, punching her with a closed fist. Next,

---

[2] The panel found appellant not guilty of one specification of attempted murder, one specification of communicating a threat, one specification of rape, one specification of sexual assault, one specification of assault consummated by a battery upon a child under the age of sixteen, seven specifications of domestic violence, two specifications of animal abuse, and one specification of indecent language in violation of Articles 80, 115, 120, 128, 128b, and 134, UCMJ.

[3] Many of appellant's actions were captured on video by the victim over the course of the night. At least seven of these videos, ranging in length, were admitted at trial.

appellant got on top of the victim, grabbed her throat with his hand, shook her, covered her mouth, and punched her in the chest. During the assault on the sofa, the recording phone captured appellant stating, "You're going to die. F****** piece of s*** and you're going to die on your own." Also recorded was appellant answering "yes" to the victim's question of whether he was going to kill her, along with the statement "F****** w**** I f****** hate you."

Following this assault, appellant got up from the sofa and walked around the kitchen, living room, and bedroom. The victim went back to the bedroom and set up her phone to record on the nightstand. More than six minutes later, the video recording captured appellant entering the bedroom. Appellant wandered around the bedroom, naked, for about five minutes before lying down at the foot of the bed where the victim lay. Next, appellant retrieved a wooden mannequin head from a nearby dresser. Appellant laid the mannequin down on the bed next to the victim's head, telling her to "calm down." The victim, still crying, stated, "please don't hit me with that" and she got off the bed. Appellant walked over to the victim, and she jumped back on the bed to get away from him. Appellant got on top of her and rubbed the mannequin against her head still telling her to "calm down." Seconds later, appellant stood up from the bed, grabbed the victim's feet and threw her off the bed before leaving the room. The recording stopped a minute after that.

Next, the victim testified appellant returned to the bedroom and became even more violent. At some point the victim was able to call 911 and was connected to a dispatcher. On the 911 recording, before the call disconnects, the victim is heard telling appellant, "Please stay away from me. Don't come near me. Please, please."

The victim testified she got off the floor and back onto the bed at which time appellant got on top of her and strangled her with his hands until she started to lose consciousness. Appellant then slapped the victim multiple times on her face. The victim was finally able to kick appellant off her and fled the room. Appellant chased her down in the home and punched her in the face in the foyer near the front door. Law enforcement arrived and detained appellant. Upon receiving a phone call from the police, the victim's two sons, ages fifteen and thirteen, awoke, then left the house and saw their mother, bleeding and bruised, outside.

## LAW AND DISCUSSION

### A. Whether the Military Judge Erred in Denying to Grant Mistrial

### I. Additional Facts

After findings were announced, the military judge temporarily released the court. When the parties returned, the trial counsel informed the military judge of a conversation between a panel member, Lieutenant Colonel (LTC)███ and Captain

(CPT) ▉, his command legal advisor,[4] following the announcement of findings. The discussion concerned another panel member, Command Sergeant Major (CSM) ▉, who LTC ▉ reportedly described as having been "the only holdout" during deliberations. After CPT ▉ responded words to the effect of, "I hate him," LTC ▉ reportedly responded he "wanted to strangle [CSM ▉]."[5]

When initially asked, defense counsel stated they were satisfied with the matter being preserved on the record, as they believed the conversation alone did not "impugn[] the record in any way." Shortly after, defense counsel asserted that any additional voir dire or factfinding should occur after the panel sentenced appellant.

Following the presentation of sentencing evidence, the military judge asked appellant whether he wished to question any panel member prior to sentencing instructions being issued. Though defense counsel initially declined again, summarizing the issue as "a personal clash" between panel members versus an inappropriate discussion of the panel's deliberative process, he asked for additional time to speak with appellant. Upon their return, and at defense's request, the military judge individually questioned both LTC ▉ and CPT ▉ After hearing LTC ▉'s responses, as noted above, defense moved for a mistrial. The military judge recessed the court and ordered both parties to submit briefs.

After this recess, the military judge indicated he intended to excuse LTC ▉, at the request of both parties, and individually question *every* panel member to ascertain whether any member had attempted to influence another member based on their rank or position or had any other improper influence on another in the panel reaching its findings. Neither party objected and LTC ▉ was permanently excused by the military judge.

During voir dire of the members, there was no evidence of improper influence or unlawful command influence. However, the additional questioning revealed other concerns. First, CSM ▉ who had previously served with CPT ▉, texted CPT ▉ during the merits portion of the trial after CSM ▉ saw her sitting in the court gallery. The text was characterized by the military judge as "the exchange of benign pleasantries between two Soldiers."[6] Second, after findings were complete, First

---

[4] Captain ▉ had been previously involved in appellant's case, however, handed off responsibility for it once charges were preferred.

[5] Lieutenant Colonel ▉ denied making this statement when he was later questioned by the military judge.

[6] The text exchange is as follows:

(continued . . .)

Sergeant (1SG) ▇ heard two friends discussing appellant's case at a bar but removed himself from the conversation. The military judge excused 1SG ▇ for sentencing and denied defense's request for a mistrial.

## II. Law and Analysis

A military judge "may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." Rule for Courts-Martial [R.C.M.] 915(a). Due to the nature of the remedy, "[t]he power to grant a mistrial should be used with great caution . . . and for plain and obvious reasons." Discussion to R.C.M. 915(a). "Absent clear evidence of an abuse of discretion, this Court will not reverse a military judge's determination on a motion for a mistrial." *United States v. Short*, 77 M.J. 148, 150 (C.A.A.F. 2018) (internal citation omitted). "In determining whether the military judge abused his discretion by not granting a mistrial, we look to the actual grounds litigated at trial." *Id.* (discussing mistrials in the context of inadmissible evidence being presented to the members) (internal citations and quotations omitted).

> A military judge abuses his or her discretion when: (1) the military judge predicates a ruling on findings of fact that are not supported by the evidence of record; (2) the military judge uses incorrect legal principles; (3) the military judge applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) the military judge fails to consider important facts.

*United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (internal citations omitted).

"'As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel.'" *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (quoting *United States v. Wiesen*, 56 M.J. 172, 174

---

( . . .continued)

    CSM ▇: Ma'am, did I see you in the Courtroom earlier?

    CSM ▇: PS this is A[A] Sorry.

    CPT ▇ Yes you did.

    CSM ▇ Nice, good to see you, hope you are well.

    CPT ▇ Good to see you too hope all is well.

    CSM ▇ – "Heart" response to CPT CJ's last text.

(C.A.A.F. 2001)). As such, members are required to be impartial and "shall be excused" from court-martial service "whenever it appears that the member: . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1), 912(f)(1)(N). However:

> due process does not require a new trial every time a juror has been placed in a potentially compromising situation . . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith v. Phillips*, 455 U.S. 209, 217 (1982).

We find the military judge did not abuse his discretion in denying the defense request for a mistrial. Lieutenant Colonel ███'s statements to CPT ███ regarding his frustration with CSM ███ were not prejudicial to appellant as the concerning conversation between LTC ███ and CPT ███ occurred after findings. Moreover, based on the military judge's voir dire of the entire panel, including CSM ███, there is no evidence LTC ███ attempted to influence CSM ███ or any other member during deliberation on the merits.

Similarly, we find the military judge's decision to excuse 1SG ███ for sentencing based on the government's unopposed request for excusal was "well within the bounds of reasonable judicial discretion." *United States v. Nguyen*, 2025 CCA LEXIS 112, at *3 (Army Ct. Crim. App. 12 Mar. 2025) (sum. disp.). Like with LTC ███, we note the conduct serving as the basis of 1SG ███'s excusal occurred *after* findings were announced. Though there was no evidence to indicate 1SG ███ behaved inappropriately, the military judge, nonetheless, excused him from participating in appellant's court-martial in an abundance of caution.

Lastly, the voir dire of the panel revealed three members knew or had previously worked with CPT ███ However, the mere presence of a judge advocate sitting in the gallery of a court-martial, who may have previously advised commanders currently sitting as panel members, does not per se establish unlawful

---

[7] Two of the members were LTC ███ and CSM ███. The final member who knew CPT ███ was CSM ███ who testified he believed she was part of his unit, but was unsure of her rank or position, and was not certain he could recognize her without a nametape.

command influence.[8] This is especially the case when only three members of the panel even knew the attorney in question, and none of them were influenced by her presence. Finally, a CSM, exchanging pleasantries via text with a judge advocate with whom they have previously served, does not demonstrate unlawful command influence.

### B. Factual and Legal Sufficiency of Child Endangerment Convictions

#### I. Additional Facts

Appellant was convicted of child endangerment based on the presence of the victim's children in the home during the assaults. Based on their testimony at trial, however, neither child witnessed nor heard the assaults. First, ▉ confirmed he was in his room asleep and did not hear any fighting, though he saw his mother with a bloody lip and welts over her body when he went outside to speak with the police. Though ▉ testified he did not feel safe continuing to live in the home, he expressed no other impact. Second, ▉ testified he was asleep in his room until awakened by ▉, and ▉ did not learn the details of what happened to their mother until the following day.

Other witnesses corroborated ▉ and ▉'s testimony. One law enforcement officer who responded to the scene described ▉ and ▉ as being "withdrawn, very quiet," however, "[n]othing that would indicate they were in fear." The children's biological father also testified ▉ said he "didn't even know what happened" and the victim told the biological father "[t]he children were fine. It wasn't like a huge catastrophe. They didn't even see anything."

#### II. Law and Analysis

This court may consider whether a guilty finding is factually sufficient "upon request of the accused if the accused makes a specific showing of a deficiency in proof." UCMJ art. 66(d)(1)(B)(i). Once these conditions are met, the court "may weigh the evidence and determine controverted questions of fact" subject to "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence" and "appropriate deference to findings of fact entered into the record by the military judge." UCMJ art. 66(d)(1)(B)(ii), (I)-(II). If the court is "clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding." UCMJ art. 66(d)(1)(B)(iii). For the court to be "clearly convinced that the finding of guilty was against the weight of the evidence," the court "must decide that the

---

[8] We note it is reasonable and even encouraged for judge advocates of CPT ▉'s rank to observe courts-martial at their local installation for their own professional development.

evidence, *as the [court] has weighed it*, does not prove that the appellant is guilty beyond a reasonable doubt.  Second, the [court] must be clearly convinced of the correctness of this decision." *United States v. Harvey*, 85 M.J. 127, 132 (C.A.A.F. 2024) (internal quotations omitted) (emphasis in original).

To convict an appellant of child endangerment, the government must establish appellant "ha[d] a duty for the care of a child under the age of 16 years" and "through design or by culpable negligence, endanger[ed] the child's mental or physical health, safety, or welfare."  UCMJ art. 119b.

> [A] criminal conviction for child endangerment requires more than a showing of irresponsible behavior coupled with speculation . . . about what *possibly* could have happened to a child as a consequence of an accused's conduct.  Rather, it requires proof that the accused's conduct . . . resulted in a reasonable *probability* that the child would be harmed.

*United States v. Plant*, 74 M.J. 297, 300 (C.A.A.F. 2015) (emphasis in original).

In this case, the government concedes the evidence admitted was factually insufficient.  Though we are not bound by this concession, we "appreciate[] reasonable concessions like these, for they reflect counsel's careful understanding of the record, and they facilitate judicial economy." *United States v. Wilson*, 2024 CCA LEXIS 327, at *6 n.9 (Army Ct. Crim. App. 5 Aug. 2024) (mem. op.).

In this instance, we agree.  Neither ▮ nor ▮ witnessed or heard the assaults against their mother.  Nor does it appear they were aware of the details of what transpired, even by the time of trial.  Simply being near a source of harm, on its own, was insufficient to establish that ▮ or ▮ were, in fact, harmed. *See Plant*, 74 M.J. at 298-99.  As such, based on the record before us, we find appellant's convictions were against the weight of the evidence and will provide relief in our decretal paragraph.  UCMJ art. 66(d)(1)(B).

### C.  *Factual Sufficiency of Specifications 9 and 10 of Charge II*

On appeal, appellant challenges the sufficiency of two of his convictions for domestic violence.  For one specification, domestic violence via "intent to threaten" (Specification 9), that he lacked the *mens rea* necessary to complete the offense,[9] and for the other specification (Specification 10), that there was no evidence he punched the victim in the arm or neck.  We agree with both contentions.

---

[9] We pause to note the "Findings Worksheet" of the Statement of Trial Results corresponding to Specification 9 of Charge II fails to include the language: "with the intent to threaten [the victim], the intimate partner of the accused . . . ."  We will correct this scrivener's error.

*I. Additional Facts*

Concerning Specification 9, one of the video exhibits admitted at trial showed appellant touching the victim with the mannequin head. Though the victim testified this was frightening, the video also captured appellant quietly asking the victim to "calm down" multiple times, even after the victim implored appellant not to strike her with the mannequin. Appellant stated, "babe calm down" and "here" before laying the mannequin on the bed near the victim's face, seemingly in an attempt to calm the crying victim. The victim got off the bed to move away from appellant and as appellant walked around the bed to move closer to her, she jumped back on the bed. Appellant got on top of her, touched the mannequin against her head and said "here you go . . . stop . . . calm down. . . calm down" before pushing her off the bed.

Appellant testified in his own defense at trial. During direct examination, he discussed reviewing the numerous videos of himself taken by the victim on the night of the assault. Based on that review, appellant described himself as being in a highly intoxicated state, under the combined effects of alcohol, caffeinated drinks, and a high dosage of a prescription medication. Appellant testified this was the first time he had consumed alcohol with his prescription pills and that rendered him the "drunkest [he had] ever been in [his] entire life."

Concerning Specification 10, based on the assaults that occurred in the living room, the government ultimately charged appellant with striking the victim's arm, cheek, neck, and head with a closed fist. Although the victim testified to feeling pain in her neck and her arms, no evidence was offered indicating appellant struck the victim's neck or arms.

*II. Law and Analysis*

To prove domestic violence via intent to threaten, the government must establish: "(1) that appellant committed an act in violation of the UCMJ; (2) that the appellant committed the act against any person; and (3) that the accused committed the act with the intent to threaten an intimate partner." *Manual for Courts-Martial*, pt. IV ¶ 78a.b(2) (2024 ed.) [*MCM*]. The third element is the one at issue here.

Giving appropriate deference to the fact the panel saw and heard the witnesses and evidence, we are clearly convinced the finding of guilty as to Specification 9 was against the weight of the evidence. The record before us reveals appellant was highly intoxicated, based on the cumulative effect of his alcohol consumption, a high dosage of a prescription drug, and a significant amount of caffeine, both before, during, and after his assaults of the victim. Further, the video evidence from that incident shows an intoxicated appellant's misguided attempt to calm the victim with the mannequin head. While we recognize the victim perceived appellant's actions as threatening, our observation of his behavior gives us pause. Appellant's calm voice,

his repeated words "calm down," and his gentle laying of the mannequin head on the bed prior to the assault does not establish a specific intent to threaten the victim in that moment. Rather, it seems to demonstrate the puzzling actions of an intoxicated appellant attempting to calm her. Considering testimony of the appellant and the victim along with the video evidence, we are clearly convinced that the finding of guilty to this specific intent offense was against the weight of the evidence. We will set aside Specification 9 in our decretal paragraph.

Regarding Specification 10, the government helpfully concedes that no evidence was offered to prove appellant struck the victim's "arm" or "neck." Our review of the record confirms that concession. As such, we will except out that language from the specification and "narrow the scope of . . . appellant's conviction to that conduct [we] deem[] legally and factually sufficient." *United States v. English*, 79 M.J. 116, 120 (C.A.A.F. 2019).

### D. Whether Specifications 8-12 of Charge II are Multiplicious

### I. Additional Facts

Defense never alleged multiplicity for the domestic violence specifications for findings. That said, defense did request merger of the specifications for findings following the close of the evidence for an unreasonable multiplication of charges (UMC).[10] The military judge denied the request. After the panel returned with findings, defense requested merger of Specifications 3, 8, 9, 10, 11, and 12 of Charge II and Specification 2 of Charge V for sentencing. The parties subsequently agreed to merge Specifications 8, 10, and 11 of Charge II for sentencing. When asked by the military judge if defense was requesting any other relief besides the agreed upon merger for sentencing, defense counsel responded, "No, Your Honor."

### II. Law and Analysis

We determine there was no affirmative and knowing waiver of multiplicity by appellant. As such, we will review for plain error whether Specifications 8, 10, 11, and 12 in Charge II were multiplicious.[11]

---

[10] This was after defense waived UMC for findings during a pretrial motions hearing. Following the close of evidence, however, defense revoked their previous waiver.

[11] The government points to the discussion of appellant's trial defense counsel with the military judge regarding UMC as evidence appellant waived his ability to allege multiplicity on appeal. While it is true UMC came up repeatedly, there was no motion or discussion on the record specifically concerning multiplicity.

(continued . . .)

To prevail under plain error, appellant must demonstrate: "(1) there was error, (2) the error was plain and obvious, and (3) the error materially prejudiced a substantial right of the accused." *United States v. Jones*, 78 M.J 37, 44-45 (C.A.A.F. 2018). "Where the error is constitutional . . . the government must show that the error was harmless beyond a reasonable doubt to obviate a finding of prejudice." *United States v. Tovarchavez*, 78 M.J. 458, 462 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

The Double Jeopardy Clause "prohibits multiple punishments 'for the same offen[s]e'" and, therefore, "multiple prosecutions . . . . [i.e.,] when the government charges a defendant twice for what is essentially a single crime." *United States v. Forrester*, 76 M.J. 479, 484-85 (C.A.A.F. 2017) (quoting U.S. Const., amend. V) (other citations omitted) (alterations in original). One species of multiplicity exists "when charges for multiple violations *of the same statute* are predicated on arguably the same criminal conduct." *Id.* at 485 (citations and internal quotations omitted) (emphasis in original). "Where appellant is charged for multiple violations of the same statute, appellant can demonstrate plain error 'by showing that the specifications are facially duplicative, that is factually the same.'" *Malone*, 85 M.J. at 582 (quoting *United States v. Heryford*, 52 M.J. 265, 266 (C.A.A.F. 2000)). Domestic violence by committing a violent offense is "a continuous course of conduct offense." *Id.*, at 584. As such, the allowable unit of prosecution "is the number of overall beatings the victim endured rather than the number of individual blows suffered." *United States v. Clarke*, 74 M.J. 627, 628 (Army Ct. Crim. App. 2015) (internal citation omitted).[12] However, if the assaults arise out of "successive impulses" that "are separately given, even though all unite in swelling a common stream of action," each offense may be separately charged. *United States v. Blockburger*, 284 U.S. 299, 302 (1932).

We find the remaining convictions for appellant's numerous assaults against the victim were not a continuous course of conduct.

Excepting Specification 9 (the mannequin head offense), which we will set aside, appellant alleges the following convictions are multiplicious (listed in the order they occurred): "pushing [the victim] into a door with his hands"

---

( . . .continued)
Unreasonable multiplication of charges and multiplicity are two separate and distinct legal concepts. *United States v. Malone*, 85 M.J. 573, 579 (Army Ct. Crim. App. 2025). So, while appellant may have waived any additional relief under UMC, that does not lead to a conclusion he affirmatively waived multiplicity.

[12] For a fuller discussion of the distinction between UMC and multiplicity, and the allowable unit of prosecution for a domestic violence offense, see this court's decision in *Malone*, 85 M.J. at 579-85.

(Specification 12), "striking [the victim] on the chest and head with a closed fist" (Specification 10),[13] "pushing [the victim] off the bed with his hands" (Specification 8), and "striking [the victim] on the head with an open hand" (Specification 11).

Each of these assaults were separated by time and place and therefore, were not multiplicious. Specification 12, the first assault, occurred at the threshold of the bedroom; the victim was attempting to coax appellant into bed, and appellant pushed her into the door. They argued in the bedroom for a period of time. Eventually, appellant chased the victim into the living room and punched her repeatedly on the couch (Specification 10). After the living room assault, the victim walked back to the bedroom, believing the assaults were over. More than ten minutes passed before appellant assaulted the victim in the bedroom (Specification 8). After pushing the victim off the bed, appellant left the bedroom, ending the assault and creating another temporal break. Upon his return, some time later, the victim testified appellant became "exceptionally violent," and began a new assault (Specification 11). The victim then fled the room before being struck, for the last time, in the face by the appellant in the foyer of the home. We find Specifications 8, 10, 11, and 12 are distinct in time and location and do not demonstrate a continuous course of conduct by appellant.

### E. Sentence Reassessment

Given our remedy of dismissing multiple specifications and modifying another, we must determine whether our "broad discretion" allows us to reassess appellant's sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Based on our experience as judges on this court, we are confident the panel would have sentenced appellant to at least a bad-conduct discharge, confinement for twenty-seven months, and reduction to the grade of E-3, given the gravamen of appellant's offense—his violent assaults against the victim—remained largely untouched.

### CONCLUSION

Upon consideration of the entire record, the findings of guilty as to Specification 9 of Charge II and Specifications 1 and 2 of Charge VI and Charge VI are SET ASIDE and DISMISSED. The words "arm" and "neck" in Specification 10 of Charge II are SET ASIDE and DISMISSED. Specification 10 of Charge II, as amended, is AFFIRMED. All other findings of guilty are AFFIRMED. We affirm only so much of appellant's sentence as extends to a bad-conduct discharge, confinement for twenty-seven months, and reduction to the grade of E-3.

---

[13] As modified, see *supra*.

Senior Judge FLEMING and Judge SCHLACK concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court